UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                    :

MELISSA C.[1],                           :          NO. 3:21 CV 1553(RMS)
*Plaintiff,*                     :
                                      :
V.                                 :
                                      :
KILOLO KIJAKAZI, ACTING        :
COMMISSIONER OF THE SOCIAL  :
SECURITY ADMIN.,            :
*Defendant.*                     :
                                    :          DATE: January 11, 2023
                                    :
------------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION FOR ORDER REVERSING AND THE COMMISSIONER'S MOTION FOR AN ORDER AFFRIMING THE DECISION OF THE COMMISSIONER

Before the Court is an administrative appeal filed by Melissa C. ("the plaintiff") pursuant to 42 U.S.C. § 405(g) following the denial of her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), for the period between September 2, 2014, and August 3, 2021.[2] The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration ("the Commissioner") and remanding the case on the grounds that Administrative Law Judge ("ALJ") Ronald J. Thomas erred by: 1) improperly

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Under the Social Security Act ("the Act"), the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. A claimant may appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967, 416.1467. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to a United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

weighing medical opinion evidence; and 2) incorrectly formulating the plaintiff's residual functional capacity ("RFC"). (Doc. No. 15-1 at 1). The plaintiff asks the Court to reverse the Commissioner's decision to deny benefits, or, in the alternative, to remand the case to afford her a full and fair hearing. (Doc. No. 15-1 at 9). The Commissioner moves to affirm the decision below, arguing that it is supported by substantial evidence. (Doc. No. 17 at 1).

For the reasons set forth below, the plaintiff's Motion for Order Reversing the Commissioner's Decision (Doc. No. 15) is **GRANTED** such that the case is remanded for further proceedings consistent with this Ruling, and the Commissioner's Motion for an Order Affirming the Commissioner's Decision (Doc. No. 17) is **DENIED**.

## I.    PROCEDURAL HISTORY

The plaintiff submitted a Statement of Facts, (Doc. No. 15-2), which the Commissioner adopts and supplements with additional information in its Response to Plaintiff's Statement of Material Facts, (Doc. No. 17-2). The Court has reviewed the parties' submissions and incorporates their contents into this Ruling.

The plaintiff alleges that her disability began on September 2, 2014.[3] (Doc. Nos. 10, 10-1, 10-2, Certified Transcript of Administrative Proceedings, dated December 23, 2021, ["Tr."] 1773). On June 8, 2015, the plaintiff filed applications for DIB and SSI. (Tr. 16). The Commissioner denied the plaintiff's applications initially on January 6, 2016, and upon reconsideration on August 25, 2016. (*Id.*).

---

[3] In her initial application for DIB and SSI, the plaintiff alleged disability beginning September 2, 2014; however, at the plaintiff's 2017 hearing, she amended the alleged onset date of her disability to February 18, 2015. (Certified Transcript of Administrative Proceedings, dated December 23, 2021, ["Tr."] 16, 38). Similarly, in the plaintiff's Social Security Complaint, she indicated that her disability began on February 18, 2015. (Tr. 1851). At the plaintiff's 2021 hearing, however, she alleged disability beginning on September 2, 2014. (Tr. 1773).

The plaintiff requested a hearing on September 16, 2016 and appeared with an attorney by video before ALJ Barry H. Best on November 2, 2017. (*Id.*, citing 20 CFR §§ 404.936(c), 416.1436(c)). Vocational expert Kenneth R. Smith also appeared by video and testified. (Tr. 16). On December 28, 2017, ALJ Best issued an unfavorable decision, denying the plaintiff's request for benefits. (Tr. 16-25, 1830-39). On November 26, 2018, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision final. (Tr. 1-5, 1845-49). The plaintiff filed a complaint in the United States District Court for the District of Connecticut on January 25, 2019, seeking judicial review of the Commissioner's decision. (Tr. 1850-54).

In a decision dated January 13, 2020, the undersigned granted the plaintiff's Motion to Reverse the Decision of the Commissioner and remanded the case "for further development of the record, reweighing of the evidence in light of any new information, a *de novo* hearing before an ALJ, and a new decision." *Camarota v. Comm'r of Soc. Sec.*, 3:19 CV133(RMS), 2020 WL 132437, *7 (D. Conn. Jan. 13, 2020). In that decision, the undersigned concluded that remand was warranted because the ALJ had committed legal error by failing to obtain additional records from Patrick Doherty, M.D., one of the plaintiff's treating physicians, or to confirm that no such records existed. *Id.* at *6. The undersigned ordered the ALJ to investigate whether records from Dr. Doherty existed, and if they did, to re-evaluate Dr. Doherty's opinion in a manner consistent with those records. *Id.* Although it was not clear to the undersigned what impact, if any, additional records from treating physician Olivia Coiculescu, M.D., would have had on the ALJ's decision, the undersigned also ordered the ALJ to investigate whether those records—or records from any of the plaintiff's other treating physicians—existed. *Id.*

On February 5, 2020, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ for further proceedings consistent with the Court's Order. (Tr.

1887). Specifically, the Appeals Council directed the ALJ to fully develop the record; to investigate the existence of additional records from Drs. Doherty and Coiculescu, as well as any other treating source; and to reevaluate Dr. Doherty's opinion in a manner consistent with the record evidence. (Tr. 1772).

On May 5, 2021, ALJ Ronald J. Thomas held an online video hearing, during which the plaintiff, her attorney, and the ALJ appeared virtually, and vocational expert Robert Baker ("VE Baker") appeared telephonically.[4] (Tr. 1772). On August 23, 2021, ALJ Thomas issued an unfavorable decision, denying the plaintiff's request for benefits. (Tr. 1772-88).[5]

On November 19, 2021, the plaintiff filed this action, (Doc. No. 1), and on November 30, 2021, the plaintiff consented to a magistrate judge, (Doc. No. 8). On January 14, 2022, the Commissioner filed the certified administrative record, (Doc. No. 10), and on March 23, 2022, the Commissioner filed a supplemental certified administrative record, (Doc. No. 14). On March 29, 2022, the plaintiff timely filed her Motion for Order Reversing the Decision of the Commissioner. (Doc. No. 15). On May 24, 2022, the Commissioner filed its Motion for an Order Affirming the Commissioner's Decision. (Doc. No. 17). This case was transferred to the undersigned for all purposes on July 5, 2022. (Doc. No. 20).

---

[4] The hearing was conducted telephonically due to the extraordinary circumstance presented by the COVID-19 pandemic. (Tr. 1772).
[5] The plaintiff filed a subsequent application for Title II disability benefits on January 28, 2019; however, the Appeals Council's action regarding the instant claim renders that claim duplicative. (Tr. 1772). Accordingly, the ALJ consolidated the claims, associated the evidence, and issued a new decision on the consolidated claims. (Tr. 1772-73, citing 20 C.F.R. § 404.952; HALLEX I-1-10-10).

## II.      FACTUAL BACKGROUND

### A.      The Plaintiff's May 2021 Hearing Testimony

At the time of her hearing in May 2021, the plaintiff was 43 years old, lived with her husband and 12-year-old son, and could drive a car. (Tr. 1801). The plaintiff has a high school diploma and has completed some college. (*Id.*).

The plaintiff stopped working as a catering manager on February 17, 2015, after having held that position for approximately four years, because she was scheduled to undergo neck surgery and because she was dropping things at work. (Tr. 1802). The plaintiff's job required her to lift up to 70 pounds. (Tr. 1803). Prior to working as a catering manager, the plaintiff was a manager at Dunkin Donuts. (*Id.*). In that position, the plaintiff was required to lift up to 20 pounds. (*Id.*).

The plaintiff testified that she was treated by her neurosurgeon, Dr. Patrick Doherty, since 2013 and that he performed one surgery in 2014 and another in 2015 to fuse four levels in her neck. (Tr. 1810, 1814). Neither surgery was successful. (Tr. 1810). The four-level cervical fusion in the plaintiff's neck caused her excruciating nerve pain on a daily basis. (Tr. 1804). The plaintiff's pain required that she take a lot of medication and interfered with her ability to sleep. (*Id.*). The plaintiff stayed at home except for those occasions when her husband accompanied her to doctors' appointments on his days off. (*Id.*). Between 2018 and 2021, she continued to experience pain starting in her neck, then moving down her shoulder blades, arms, and legs, which sometimes caused her to fall. (Tr. 1810).

She stated that, more recently, Dr. Doherty intended to perform a spinal decompression and insert a sixth-level fusion in her neck. (*Id.*). Nurse practitioner Kim Kurey, the plaintiff's pain specialist, encouraged the plaintiff to seek a second opinion before undergoing this surgery

because of the proximity of the herniated level above the plaintiff's fusion to her brainstem. (Tr. 1815). The plaintiff sought a second opinion from Dr. Daniel Rubio, who told her that she would experience pain for the rest of her life and that her spine would degenerate by 2.9 percent every ten years. (Tr. 1816). In light of Dr. Rubio's concern that a spinal decompression could leave her paralyzed, the plaintiff opted not to undergo the procedure. (*Id.*).

The plaintiff received trigger point injections from her pain specialist for at least five years, the most recent of which she received the day before the hearing. (Tr. 1804, 1811). She typically experienced some relief from the pain for approximately one or two days after each injection. (Tr. 1812). To alleviate her pain, the plaintiff took medications five times per day; however, she did not see any improvement. (*Id.*).

The plaintiff did not lift anything at home and was prescribed a cane, which she used to help her walk. (Tr. 1804-05). Even with the cane, however, she experienced pain after walking 20 feet. (Tr. 1804). The plaintiff could stand for approximately five minutes and sit for approximately 20 minutes. (Tr. 1805). By contrast, approximately three years earlier, in March 2018, she had been able to walk without a cane for greater distances. (Tr. 1810).

The plaintiff was diagnosed with Hashimoto's disease two years prior to the hearing. (Tr. 1805). As a result of this condition, which affects the thyroid, the plaintiff suffered from heavy sweating and forgetfulness. (*Id.*). She was under the care of a doctor and was prescribed medication for this condition. (*Id.*).

The plaintiff also claimed she suffered from anxiety-induced epilepsy but had not experienced a seizure in approximately eight months. (Tr. 1806, 1818). She was prescribed medication for her seizures and sought counseling for her anxiety. (Tr. 1806). She also suffered from incontinence. (Tr. 1818).

In addition, she testified that she was diagnosed with neuropathy in both arms and was prescribed Gabapentin. (Tr. 1807). She was unable to drive, carry laundry upstairs, or cook because of her condition. (*Id.*). Her husband helped her wash and dress, and she required the assistance of a shower chair. (*Id.*). She did not shop for groceries, play sports, exercise, or travel out of town. (Tr. 1808).

At the end of 2017, the plaintiff could walk a couple of blocks without severe pain and sit for approximately two hours in an eight-hour workday. (Tr. 1811). If she sat for longer than that, she experienced muscle spasms in her neck and shoulder blade. (*Id.*). She testified that she experienced fatigue even without exerting herself and difficulty sleeping for approximately five years because of the pain in her arm, shoulder, and leg. (Tr. 1813). She took naps during the day that lasted between 30 minutes and a couple of hours. (Tr. 1814).

The plaintiff testified that, since her surgery in 2015, she tended to be in excruciating pain before it rained or snowed. (Tr. 1819).

**B.    VE Baker's Hearing Testimony**

VE Baker also testified at the plaintiff's hearing in May 2021. He explained the plaintiff's RFC using various hypothetical scenarios. (Tr. 1819-24).

VE Baker classified the plaintiff's past work as a fast-food services manager and caterer helper as light work. (Tr. 1820). The ALJ presented VE Baker with a hypothetical involving an individual limited to the sedentary exertion level, who could occasionally bend and balance, twist and squat, kneel, and crawl and climb; could not climb rope, scaffolds, or ladders; must avoid hazards such as heights, vibration, dangerous machinery, including driving; could frequently handle and finger bilaterally; could occasionally reach overhead bilaterally; and could occasionally

interact with coworkers, supervisors, and the public. (Tr. 1821-22). VE Baker testified that such an individual could not perform the plaintiff's past work. (Tr. 1822).

VE Baker further opined that, if another hypothetical individual with the same limitations also required a cane to walk, she could not perform the plaintiff's past work. (Tr. 1822-23).

VE Baker testified that both hypothetical individuals could perform the work of an addresser, tube operator, or document preparer. (*Id.*). An addresser is a sedentary job, and at the time of the hearing, there were approximately 2,733 individuals employed full time in that position nationally. (Tr. 1822). A tube operator is also a sedentary job, and at the time of the hearing, there were approximately 2,952 individuals employed full time in that position nationally. (*Id.*). Finally, a document preparer (microfilming) is a sedentary job, and at the time of the hearing, there were approximately 19,168 individuals employed full time in that position nationally. (*Id.*).

C.     **Medical Opinion Evidence**

In accordance with the undersigned's January 13, 2020 remand order, the Appeals Council directed the ALJ to fully develop the record; investigate the existence of additional records from Dr. Doherty, Dr. Coiculescu, and any other treating source; and re-evaluate Dr. Doherty's opinion in a manner consistent with the record as a whole. (Tr. 1772). At the request of ALJ Thomas at the May 2021 hearing, the plaintiff's attorney submitted a letter outlining the plaintiff's treatment with Drs. Doherty and Coiculescu, which included citations to their treatment records in the transcript. (*Id.*, citing Tr. 2171-72). Dr. Doherty's notes reflect that he treated the plaintiff from December 2013 through March 24, 2021, and Dr. Coiculescu's notes reflect that she treated the plaintiff between December 2013 and December 2017. (Tr. 1772). At the hearing level, the ALJ received recent records relating to diagnostic testing of the plaintiff's cervical spine on March 31, 2021, as well as an orthopedic visit with Dr. Rubio in May 2021. (*Id.*, citing Tr. 3491, 3730-52). The ALJ

also considered additional records relating to the plaintiff's treatment with Dr. Coiculescu.[6] (Tr. 1772, citing Tr. 3496-638).

### 1.     Treating Neurosurgeon Patrick Doherty, M.D.

The plaintiff began treating with Dr. Doherty on December 11, 2013 and continued through March 24, 2021. (*See* Tr. 2171-72). During the plaintiff's initial visit with Dr. Doherty in December 2013, she presented with mildly diminished strength and decreased sensation in the C6 disc; nearly absent reflex in the left brachial radialis; neck pain and decreased cervical range of motion; and a palpable intrascapular knot. (Tr. 990). The results from a March 2013 MRI showed a disc herniation on the left at C4-5 and C5-6. (*Id.*). Dr. Doherty indicated that the plaintiff had significant C6 and left C5 radiculopathy, and that her symptoms had worsened since the MRI. (*Id.*).

On January 2, 2014, the plaintiff had another cervical spine MRI. (Tr. 980). Dr. Doherty reviewed those MRI results and observed mild asymmetric disc bulging towards the left at C4-C5; moderate right paracentral disc herniation; mild spinal cord impingement; moderate narrowing of the right neural foramen at C5-C6; and mild diffuse disc and foraminal bulging at C6-C7. (Tr. 980). Based on these results, on January 21, 2014, Dr. Doherty performed a C5-6 anterior cervical discectomy and fusion to correct the plaintiff's severe radicular symptoms; neck pain, which radiated to both forearms; and bilateral thumb numbness. (Tr. 977).

On April 1, 2015, Dr. Doherty examined the plaintiff and indicated in his notes that she "did well until August, 2014," when she developed numbness and pain in her right upper arm. (Tr. 855). Dr. Doherty reviewed imaging from the plaintiff's MRI on December 28, 2014 and observed disc degeneration above and below her fusion. (*Id.*). He noted that the plaintiff's first trigger point

---

[6] The Court is satisfied that, by considering this additional medical opinion evidence, the ALJ adequately developed the plaintiff's treatment records as directed in the Court's remand decision.

injection "helped marginally," but the next two injections worsened her neck and right arm pain, numbness, and headaches. (*Id.*). On examination, Dr. Doherty observed trace weakness against resistance in the plaintiff's right biceps; abnormal light touch sensation and extremely abnormal pin prick sensation in her upper right arm; right C5 and C7 numbness; decreased reflexes in her upper right arm; and tenderness and abnormal sensation in her neck. (Tr. 857-58). To address the plaintiff's symptoms, Dr. Doherty recommended C4-5 cervical disc arthroplasty, C6-7 extension of prior C5-6 fusion, and removal of hardware at C5-6. (Tr. 859).

Dr. Doherty's notes from April 16, 2015 indicate that, although the plaintiff's January 2014 surgery had been successful initially, the plaintiff had developed severe radicular symptoms and neck pain. (Tr. 954). To correct the disc degeneration and herniation above and below the plaintiff's C5-6 fusion, Dr. Doherty removed a C5-6 plate, performed an anterior discectomy and fusion at C4-5 and C6-7, and inserted a metal plate at C4-7. (*Id.*). In treatment notes from the plaintiff's post-operative visit on April 25, 2015, Dr. Doherty stated that the plaintiff was "doing very well at home," ambulating, and experiencing "less and less arm symptoms." (Tr. 950). Dr. Doherty also noted that the plaintiff had recently begun experiencing neck pain that radiated to the back of her head and into her left arm, as well as left arm and leg pain and numbness. (*Id.*).

In his report from the plaintiff's visit on July 1, 2015, Dr. Doherty indicated that "[s]he ha[d] significant limitation in cervical spine range of motion in all planes." (Tr. 773). X-rays from the plaintiff's visit on August 24, 2015, showed "slight collapse of her disc at C4-C5 as well as C6-C7." (Tr. 765). On October 31, 2015, Dr. Doherty reviewed MRI results and observed no change in the plaintiff's condition since her previous visit in late August 2015. (Tr. 940). Notes from the plaintiff's visit on November 24, 2015, indicated that an "MRI demonstrate[d] pathology behind C4-C5 causing mild compression against the spinal cord, [which] correlate[d] with the

patient's symptoms," and that the plaintiff "also ha[d] some pathology at C6-C7." (Tr. 760). These notes also indicated that the plaintiff displayed "[g]eneralized weakness with a 3/5 shoulder shrug on the left compared to the right which is 5/5." (Tr. 763).

On October 22, 2017, Dr. Doherty completed a physical medical source statement regarding the plaintiff's neck and back pain. (Tr. 1765-68). Dr. Doherty indicated that the plaintiff was diagnosed with neck and back pain; her prognosis was fair; and her symptoms included pain, decreased range of motion, and fatigue. (Tr. 1765). He characterized the plaintiff's neck pain as consistent and her back pain as frequent. (*Id.*). He indicated that the plaintiff's impairments have lasted or could be expected to last at least twelve months, and that emotional factors did not contribute to the severity of her symptoms and functional limitations. (*Id.*).

Dr. Doherty opined that, in a competitive work environment, the plaintiff would be able to walk two city blocks without rest or severe pain; stand/walk for less than two hours in an eight-hour period; and sit for about two hours in an eight-hour period. (Tr. 1766). Dr. Doherty further opined that because of the plaintiff's muscle weakness and pain, she needed a job that permitted her to shift positions at will from sitting, standing, or walking; periods of walking around for five minutes every 30 minutes during an eight-hour workday; and unscheduled five-minute breaks every 30 minutes during an eight-hour workday. (*Id.*). Dr. Doherty stated that, in a competitive work environment, the plaintiff would be able to lift less than ten pounds frequently; ten pounds occasionally; 20 pounds rarely; and 50 pounds never. (Tr. 1767). He indicated that she could climb stairs occasionally; twist and stoop rarely; crouch/squat and climb ladders never; and reach, handle, or finger with significant limitations. (*Id.*). Dr. Doherty opined that the plaintiff's symptoms were likely severe enough to interfere with the attention and concentration needed to perform even simple work tasks during 25 percent or more of a typical workday. (Tr. 1768). He opined that the

plaintiff was capable of low stress work only; her impairments were likely to produce "good days" and "bad days"; and she was likely to be absent from work because of her impairments or treatment for an average of approximately four days per month. (*Id.*). Finally, Dr. Doherty opined that the plaintiff's impairments were "reasonably consistent" with her symptoms and functional limitations, and that she had experienced these symptoms and limitations for more than two years. (*Id.*).

On March 6, 2020, Dr. Doherty met with the plaintiff to review the results from a recent MRI. (Tr. 3032). Dr. Doherty's notes indicate that the plaintiff presented in mild distress with a chronic cough related to Hashimoto's disease. (*Id.*). He stated that the medication the plaintiff had been taking for muscle spasms in her back "did not appear to be doing much" since she continued to experience severe spasms, and she suffered from a significant disability that included cervical disc degeneration and lower back pain. (*Id.*). On August 27, 2020, the plaintiff had a telehealth visit with Dr. Doherty during which she reported that she had been experiencing severe neck pain for 15 days and that medication was not providing relief. (Tr. 3050). Dr. Doherty observed that the plaintiff had decreased range of motion in her cervical spine. (*Id.*). During an in-person examination on October 30, 2020, Dr. Doherty observed that the plaintiff had decreased cervical range of motion and paraspinal tenderness. (Tr. 3079).

On March 10, 2021, Dr. Doherty examined the plaintiff and observed extremely abnormal light touch sensation in her upper left arm, neck tenderness, and abnormal range of motion in her neck. (Tr. 3623). Based on his examination, Dr. Doherty concluded that the plaintiff may require posterior cervical decompression at the lower end of the prior fusion at C7-T1, but first, he wanted to try a posterior facet injection. (Tr. 3624). If the injection did not help, then he was not confident

that surgery would be beneficial. (*Id.*). In conclusion, Dr. Doherty stated: "Regardless, I believe [the plaintiff] is fully disabled from gainful employment." (*Id.*).

That same day, Dr. Doherty also completed a physical capacity statement regarding the plaintiff's neck and back pain. (Tr. 3394-99). Dr. Doherty based his opinions on the plaintiff's history and medical file; physical therapy reports; laboratory reports and other tests; progress and office notes; physical examinations; and X-Rays, CT scans, and MRIs. (Tr. 3399). In his statement, Dr. Doherty indicated that the plaintiff was diagnosed with cervical and lumbar pain and degeneration. (Tr. 3394). He stated that the plaintiff's prognosis was poor, and that her symptoms included pain, decreased range of motion, headaches, and issues with her gait. (*Id.*). He characterized her neck pain as constant on the left side, and her back pain as frequent, nearly daily. (*Id.*). He indicated that the plaintiff experienced reduced effectiveness as a side effect of her medications, and that her impairments, symptoms, and limitations had lasted since the date she could no longer work. (*Id.*). Dr. Doherty identified anxiety as a psychological condition and emotional factor that affected the plaintiff's physical condition and/or contributed to the severity of her symptoms and functional limitations. (*Id.*). Dr. Doherty opined that the plaintiff constantly experienced pain so severe and frequently experienced stress so severe that they interfered with the attention and concentration needed to perform simple work tasks. (Tr. 3395). Dr. Doherty further opined that, if the plaintiff was placed in a competitive work environment on an eight-hour workday basis, she could not walk one city block or more without rest or severe pain; walk one block or more on rough or uneven ground; climb steps without using a handrail at a reasonable pace; balance while ambulating; or stoop, crouch, or bend. (*Id.*). He also stated that the plaintiff needed to lie down and/or recline for approximately two hours during an eight-hour workday due to fatigue and pain. (*Id.*). He explained that, during an eight-hour workday, the plaintiff could sit

and stand for approximately two hours and required unscheduled breaks away from her work area to lie down/sit quietly for an average of 15 minutes. (Tr. 3396).

Dr. Doherty further opined that, in a competitive work environment, the plaintiff could lift less than five pounds frequently; five pounds occasionally; ten and 15 pounds rarely; and 20 pounds or more never. (Tr. 3397). He stated that the plaintiff had significant limitations with reaching, handling, or fingering, and that ten percent of the plaintiff's eight-hour workday was spent grasping, turning, and twisting objects with her right and left hands; engaging in fine manipulations with her right and left fingers; and reaching (including overhead) with her right and left arms. (*Id.*). He opined that the plaintiff could push or pull arm or leg controls from a sitting position for six or more hours during an eight-hour workday, and climb stairs and ramps; however, she could not climb ladders, scaffolds, or ropes. (*Id.*).

Dr. Doherty specified that the plaintiff had difficulty hearing, and that, based upon the combination of the plaintiff's physical and/or mental limitations, she would be "off task" (*i.e.*, either unable to perform work and/or away from the work environment due to her limitations) for ten percent or less of an eight-hour workday in a competitive work environment. (Tr. 3398). Dr. Doherty estimated that, on average, the plaintiff was likely to be absent from work at least five days per month because of her physical and/or mental impairments, and/or her ongoing and periodic medical treatment and care. (*Id.*). He further estimated that, on average, the plaintiff was likely unable to complete an eight-hour workday at least five days per month because of her physical and/or mental impairments, and/or her ongoing and periodic medical treatment and care. (*Id.*). According to Dr. Doherty, the plaintiff could be expected to perform a job eight hours per day, five days per week, on a sustained basis less than 50 percent as efficiently as an average worker. (*Id.*). Dr. Doherty indicated that he believed, with a reasonable degree of medical certainty,

that the plaintiff's medical impairments and physical and/or mental limitations prohibited her from obtaining and retaining work in a competitive environment for eight hours per day, five days per week. (*Id.*).

At the plaintiff's next and final examination on March 24, 2021, Dr. Doherty continued to observe abnormalities in her upper left arm and neck. (Tr. 3627-28).

### 2.    Treating Nurse Practitioner Kim Kurey

The plaintiff's pain management treatment with nurse practitioner ("NP") Kim Kurey began in January 2016 and continued until February 2021. (Tr. 1781). During NP Kurey's first physical examination of the plaintiff on January 8, 2016, she observed tenderness and abnormal range of motion in the plaintiff's neck, stiffness in her back, and trace weakness in both of her hands. (Tr. 317). NP Kurey reviewed the plaintiff's MRI and observed pathology behind C4-C5, which was causing mild compression against the plaintiff's spinal cord, particularly on the left side, as well as some pathology at C6-C7 on both sides with focal neurocompression. (*Id.*). NP Kurey opined that these observations coincided with the plaintiff's pain and stiffness symptoms. (*Id.*).

On March 8, 2016, the plaintiff reported to NP Kurey that she was not getting much relief with the medications she was taking at the time; that her pain worsened with activity; and that she experienced moderate relief with opiates, rest, and heat. (Tr. 306). Moreover, she reported that her activity and cervical rotation were limited since they aggravated her pain level, which was a 5-6/10 most days. (*Id.*). On physical examination, NP Kurey observed that the plaintiff appeared uncomfortable and displayed tenderness and abnormal range of motion in her neck; stiffness in her back; and trace weakness against resistance in her left and right hands. (Tr. 309).

During the plaintiff's visits with NP Kurey on April 21, 2016 and August 5, 2016, NP Kurey noted that the plaintiff "does remain functional at home and is able to do her own [activities of daily living] and household chores. She has a 6 YO son who she care[s] for as well." (Tr. 301, 1215). NP Kurey also indicated that the plaintiff's "pain is worse with activity and she does get moderate pain relief with opiates, rest and heat." (*Id.*). On physical examination during the plaintiff's April 2016 visit, NP Kurey observed tenderness and abnormal range of motion in the plaintiff's neck, as well as stiffness in her back. (Tr. 304).

On July 7, 2016, NP Kurey administered trigger point injections into the plaintiff's bilateral upper and lower cervical paraspinals, as well as her upper trapezius musculature. (Tr. 749).

During the plaintiff's visit with NP Kurey on August 5, 2016, she reported that she had been walking and jogging for exercise. (Tr. 1215). On physical examination, NP Kurey observed that the plaintiff exhibited decreased range of motion, tenderness, and pain in her cervical back. (Tr. 1216).

On September 2, 2016, the plaintiff reported to NP Kurey that her opioid medication therapy provided moderate pain relief and increased her function and mobility. (Tr. 1222). The plaintiff also reported that she was experiencing increased neck and back pain, especially when she used her arms, as well as significant weakness in her grip strength. (*Id.*). On examination, the plaintiff exhibited decreased range of motion, tenderness, pain, and spasm in her cervical back. (Tr. 1224).

In treatment notes from the plaintiff's visit on October 7, 2016, NP Kurey indicated that the plaintiff had neck and lower back pain, which was radiating into her leg and foot. (Tr. 1233). NP Kurey also stated that the plaintiff was "able to do her household chores and activities of daily living without much difficulty." (*Id.*). Although the trigger point injections the plaintiff received

16

at her previous visit helped decrease her muscle spasms and pain by approximately 50 percent for about one week, she continued to experience pain that increased when she used her arms, as well as significant weakness in her grip strength. (*Id.*). On physical examination, the plaintiff displayed decreased range of motion, tenderness, and pain in her cervical and lumbar back, as well as spasm in her cervical back. (Tr. 1235). NP Kurey administered trigger point injections in the plaintiff's upper and lower cervical musculature, as well as her upper trapezius musculature. (*Id.*).

On November 3, 2016, the plaintiff reported to NP Kurey that she was "functionally independent at home" and able to do household chores and activities of daily living with her child, but she continued to experience pain when she "overdoes it," particularly when she used her arms, as well as significant weakness in grip strength. (Tr. 1236). On examination, the plaintiff continued to exhibit the same cervical and lumbar back symptoms as she did during her previous visit. (Tr. 1238).

On December 2, 2016, December 30, 2016, January 27, 2017, February 24, 2017, and March 24, 2017, the plaintiff told NP Kurey that she continued to use opiate medications to help her remain functional and active in her life, and that she was unable to perform any of her daily activities without them. (Tr. 1239, 1243, 1246, 1249, 1252). Although the plaintiff reported experiencing a reduction in pain from the trigger point injections and functional independence without the assistance of assistive devices for mobility, her pain increased with cervical flexion and extension, and when she worked with her hands overhead. (Tr. 1240, 1243, 1246, 1249, 1252). On examination, the plaintiff continued to exhibit the same cervical and lumbar back symptoms as she did during her previous visits. (Tr. 1241, 1244, 1247-48, 1251, 1254). During her February 2017 visit, the plaintiff stated that she and her husband were planning to take their son to Florida. (Tr. 1249). On examination during the plaintiff's visits in February and March 2017,  NP Kurey

observed mild swelling over the plaintiff's upper trapezius in addition to her usual symptoms. (Tr. 1251, 1254).

Upon the plaintiff's return from a trip to Florida in April 2017, she visited NP Kurey for lidocaine injections into her upper and lower cervical paraspinals and upper trapezius musculature. (Tr. 2499-2501). On May 15, 2017 and June 14, 2017, NP Kurey administered trigger point injections to alleviate the plaintiff's chronic pain. (Tr. 2496-99, 2492-94).

On August 9, 2017, October 4, 2017, November 1, 2017, December 7, 2017, and January 3, 2018, NP Kurey administered trigger point injections. (Tr. 2430-33, 2435-41, 2445-48, 2483-86). Although the plaintiff reported to NP Kurey during her January 2018 visit that she was homeschooling her child and was able to complete household chores if she took breaks, she also reported that "[h]er neck and low back pain are increased when looking up or down for extended periods of time, standing or walking or when she overdoes it." (Tr. 2430-33). On February 28, 2018, NP Kurey injected the plaintiff's cervical trigger points and the plaintiff reported continued low back pain that seemed to be worsening, especially when she sat, stood, or walked for extended periods. (Tr. 2408-10). NP Kurey administered additional trigger point injections on March 28, 2018 and September 5, 2018. (Tr. 2403-06, 2383-86). On October 3, 2018, the plaintiff reported to NP Kurey that she experienced modest pain relief when she changed positions, laid supine, and used heat and ice. (Tr. 2380-83). The plaintiff reported to NP Kurey on December 5, 2018 that she had been suffering from increased cervical pain for the past few months. (Tr. 2376). In her progress notes, NP Kurey stated that the plaintiff was "finding it difficult to look up or down for extended periods of time, working with her arms or lifting any object greater than 5 pounds. She does continue to use medical marijuana which does seem to be effective for muscle spasms and tightness but is not helping for the mechanical pain. Her low back pain is worse when she is sitting, standing

or walking for extended periods of time." (*Id.*). On physical examination, NP Kurey observed decreased range of motion, tenderness, pain, and spasm in the plaintiff's cervical spine, as well as spasms in her lumbar back. (Tr. 2378). NP Kurey administered trigger point injections on December 5, 2018 and January 16, 2019. (Tr. 2378, 2368).

On February 14, 2019, the plaintiff reported to NP Kurey that "[s]he [did] not feel she [wa]s getting adequate pain control [with her] current medication regimen. She [wa]s suffering increased pain which last[ed] 24 hours a day seven days a week." (Tr. 2363). The plaintiff also stated that she continued to take care of her family, perform her own personal care, and do household chores with frequent breaks between activities. (*Id.*).

On September 10, 2019, the plaintiff received trigger point injections from NP Kurey. (Tr. 3401-04). The plaintiff reported that she was getting good results from the injections and that, when her pain was under control, she was active at home and in her social life; she had increased function and mobility; and she was able to do laundry, cook, clean, and raise her son. (Tr. 3402). On examination of the plaintiff, NP Kurey observed decreased range of motion and tenderness in the plaintiff's spine, tenderness in her back; pain in her low back with rotation to the left and right; decreased range of motion and abduction in her right and left shoulders; decreased range of motion and grip in her right and left hands; and decreased reflexes in her left bicep, tricep, patella, and Achilles. (Tr. 3403).

During a follow-up visit on October 8, 2019, the plaintiff reported that she experienced increased pain after she helped move items into her new house. (Tr. 3406). The plaintiff's physical examination showed muscle rigidity; severely decreased range of motion; muscle tightness; pain upon palpation of her cervical paraspinals and upper trapezius musculature; tenderness and decreased range of motion in her spine; decreased range of motion and abduction in her right and

19

left shoulders; and normal gait. (Tr. 3407). NP Kurey performed trigger point injections, which

the plaintiff tolerated well. (Tr. 3408). On examination during the plaintiff's visits on November

5, 2019 and December 4, 2019, NP Kurey made similar physical observations and administered

trigger point injections. (Tr. 3411-12, 3416-17).

The plaintiff returned to NP Kurey for trigger point injections on January 6, 2020 and

February 19, 2020. (Tr. 3419-24). In January 2020, the plaintiff reported an "increase in function

mobility with use [of] this [medication] regimen however she d[id] continue to have significant

amount of pain." (Tr. 3419). The plaintiff further reported that "[s]he [wa]s able to perform her

own personal care, household chores such as cooking, cleaning and laundry but ha[d to] take

breaks between activities." (*Id.*). In February 2020, NP Kurey noted that the plaintiff "ha[d] been

suffering exacerbation of neck pain for the past two weeks or so"; was "having a difficult time

keeping her pain controlled as well as initiating sleep at night"; and was "able to perform her own

personal care, household chores such as cooking, cleaning and laundry but ha[d] to take breaks

between activities [and wa]s finding [it] harder to perform activities." (Tr. 3422). On March 4,

2020, the plaintiff's neck pain became so severe that she could not get out of bed for five days, so

she requested an emergency appointment with NP Kurey for more trigger point injections. (Tr.

3425-29).

The plaintiff continued to meet with NP Kurey virtually and in person for trigger point

injections between March 2020 and April 2021. (Tr. 3430-94). The plaintiff consistently reported

that she experienced worsening pain in her back that radiated into her legs. (*Id.*).

On April 6, 2021, the plaintiff visited NP Kurey after an unsuccessful facet injection. (Tr.

3487-94). NP Kurey performed trigger point injections and referred the plaintiff for a pain

consultation. (Tr. 3494).

### 3.    Treating Neurologist Olivia Coiculescu, M.D.

The plaintiff received treatment for her seizures from Dr. Coiculescu beginning on December 18, 2013. (*See* Tr. 933-37).

On March 30, 2015, Dr. Coiculescu reviewed the results from the plaintiff's December 2014 MRI in anticipation of her upcoming surgery with Dr. Doherty. (Tr. 354). Dr. Coiculescu observed progression in disc disease at the C4-5 and C6-7 levels with areas of canal stenosis or neural foramen encroachment. (*Id.*).

On August 19, 2016, September 7, 2016, and September 21, 2016, Dr. Coiculescu conducted physical examinations of the plaintiff, and, on each occasion, she observed that the plaintiff had full strength in her left and right upper and lower extremities, as well as a normal gait. (Tr. 1220, 1227, 1231).

Dr. Coiculescu saw the plaintiff on June 14, 2017 for worsening headaches. (Tr. 2489-91). Dr. Coiculescu ordered an electromyography, prescribed Ekavil, and referred the plaintiff for an evaluation at a pain clinic. (*Id.*).

The plaintiff underwent an electromyography on August 8, 2017, which confirmed C6 radiculopathy and mild left carpel tunnel syndrome. (Tr. 2188-97, 2486).

### 4.    Treating Orthopedic Spine Surgeon Daniel Rubio, M.D.

On April 20, 2021, the plaintiff met with Dr. Rubio for the first time. (Tr. 3637-38). Dr. Rubio indicated in his notes that, although the plaintiff's March 31, 2021 cervical spine MRI showed adjacent segment disease above and below the cervical fusion, he "would be reluctant to offer [the plaintiff] surgical decompression with instrumentation at the levels above and below as [he] would be unsure of the expected improvement postoperatively. This [wa]s true especially given that after her indicated surgeries in 2014 and 2015 she only achieved 20% improvement in

her symptoms." (Tr. 3637). Instead of surgery, Dr. Rubio recommended an MRI of the plaintiff's thoracic spine and an evaluation to rule out a primary neurologic disorder. (Tr. 3638).

On May 19, 2021, Dr. Rubio reviewed the plaintiff's thoracic spine MRI from May 5, 2021 and did not observe evidence of significant canal stenosis. (Tr. 3751). Dr. Rubio stated that the plaintiff's symptoms suggested "cervical spondylosis with adjacent segment disease and possible primary neurologic disorder." (*Id.*). He reiterated his recommendation that the plaintiff seek a neurologic consultation and indicated his willingness to re-examine the plaintiff afterwards. (Tr. 3752).

### D.     The ALJ's August 3, 2021 Decision

In a decision dated August 3, 2021, ALJ Thomas found that the plaintiff was not disabled. (*See* Tr. 1775-88).

Following the five-step evaluation process,[7] the ALJ found that the plaintiff met the insured status requirements through March 31, 2018 and had not engaged in substantial gainful activity since September 2, 2014, the alleged onset date.[8] (Tr. 1775, citing 20 C.F.R. §§ 404.1571, *et seq.*, 416.971, *et seq.*).

---

[7] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, however, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, however, then an ALJ must compare the claimant's impairment with those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If, however, a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must demonstrate that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). A claimant is entitled to receive disability benefits only if she demonstrates that she cannot perform her former work and the Commissioner fails to show that the claimant can perform alternative gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[8] The plaintiff was not working at the time of her surgery on January 21, 2014; however, she returned to work at some point after her surgery and continued working until February 17, 2015. (Tr. 1775). Although the ALJ found that the

At step two, the ALJ found that the plaintiff had the following severe impairments: cervical degenerative disc disease with surgeries in 2014 and 2015; seizure disorder; and anxiety disorder. (Tr. 1776, citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The ALJ also found evidence in the record that the plaintiff had the following non-severe impairments involving only slight abnormalities that had no more than a minimal effect on her ability to meet the basic demands of her work activity: Gastrointestinal Esophageal Reflux ("GERD"); gastritis; anemia; Hashimoto's disease; thyroid nodule; obesity; and incontinence. (Tr. 1776, citing 20 C.F.R. §§ 404.1522, 416.922). The ALJ found that the plaintiff managed her non-severe conditions medically, that no further treatment was recommended or anticipated for these conditions, and that there was no evidence in the record to suggest that these impairments caused more than a slight restriction in the plaintiff's ability to perform basic work activities. (Tr. 1776). Regarding the plaintiff's obesity diagnosis, the ALJ considered that the plaintiff's body max index exceeded 30 but found little evidence in the record to suggest that the plaintiff's weight had any quantifiable impact on her musculoskeletal, respiratory, or cardiovascular functions, or on any of her other body systems. (*Id.*). The ALJ concluded that the plaintiff's obesity was a non-severe condition since the plaintiff did not allege— and the record did not demonstrate—that her obesity more than minimally impacted her ability to perform basic work activities. (Tr. 1776-77). The ALJ considered all the plaintiff's medically determinable impairments, including those that were non-severe, when assessing her RFI. (Tr. 1777).

---

plaintiff's work in 2014 qualified as substantial gainful activity, the record is unclear as to the date she returned to work after her surgery. (Tr. 1775-76). In light of this ambiguity in the record, the ALJ afforded the plaintiff the benefit of finding no evidence that she had engaged in substantial gainful activity after September 2, 2014, the alleged onset date. In particular, though the ALJ noted that the plaintiff did indeed work after September 2, 2014, he concluded that this work did not qualify as substantial gainful activity. (*Id.*)

The ALJ also addressed the plaintiff's mental impairments. (*See* Tr. 1777-78). He found that the plaintiff had a mild limitation in understanding, remembering, and applying information; however, he found no evidence in the record of any significant loss of cognitive functioning or limitations to the plaintiff's ability to understand and follow work tasks. (*Id.*). Indeed, the ALJ found that the record reflected the plaintiff's capacity to follow instructions and carry out tasks, as evidenced by her ability to relate her medical history to her treatment providers. (*Id.*, citing Tr. 300-1768, 2173-3786). The ALJ found that the plaintiff had a mild limitation in her ability to interact with others; concentrate, persist, and maintain pace; and adapt and manage herself; however, he found no evidence in the record that the plaintiff had a "serious and persistent" mental disorder. (Tr. 1778).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1777, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

The ALJ determined that the plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she could occasionally twist, squat, bend, balance, kneel, crawl, and climb; could not climb ropes, scaffolds, or ladders; must avoid hazards such as heights, vibration, and dangerous machinery, including driving; could frequently handle and finger bilaterally; could occasionally reach overhead bilaterally; may require a cane to walk; and may occasionally interact with coworkers, supervisors, and the public. (Tr. 1779).

At step four, the ALJ found that the plaintiff was not capable of performing any of her past relevant work. (Tr. 1785, citing 20 C.F.R. §§ 404.1565, 416.965). Finally, at step five, the ALJ

considered VE Baker's testimony[9], as well as the plaintiff's age, education, work experience, and RFC, and concluded that she was capable of adjusting successfully to other work that existed in significant numbers in the national economy. (Tr. 1787). Accordingly, the ALJ concluded the plaintiff had not been under a disability at any time between September 2, 2014 and August 3, 2021. (*Id.*, citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).

## III.    STANDARD OF REVIEW

Disabled individuals are entitled to receive benefits under the Social Security Act. 42 U.S.C. §§ 423(a)(1), 1381a. To be considered disabled and therefore entitled to DIB, a claimant must demonstrate that she is unable to work after a certain date "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such impairment must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 416.920(c) (requiring that a "severe" impairment or combination thereof "significantly limit[] . . . physical or mental ability to do basic work activities").

When an ALJ determines that a claimant is not disabled and the Commissioner upholds the ALJ's decision, the claimant may seek judicial review by a United States district court. *See* 42 U.S.C. § 405(g). In this capacity, the district court performs "an appellate function." *Zambrana v.*

---

[9] VE Baker testified that an individual with the plaintiff's age, education, work experience, and RFC would be able to perform the requirements of representative occupations including: 1) Addresser, performed at the sedentary exertional level, with an estimated 2,733 jobs in the national economy; 2) Tube Operator, performed at the sedentary exertional level, with an estimated 2,952 jobs in the national economy; and 3) Document Preparer, performed at the sedentary exertional level, with an estimated 19,168 jobs in the national economy. (Tr. 1787).

*Califano*, 651 F.2d 842, 844 (2d Cir. 1981). When reviewing a denial of DIB, a district court may

not make a *de novo* disability determination. *Wagner v. Sec'y of Health & Human Serv's*, 906 F.2d

856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the ALJ applied the

correct legal principles in reaching his conclusion, and whether his decision is supported by

substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("On judicial review, an

ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence'") (quoting

42 U.S.C. § 405(g)). Absent legal error, the district court many not set aside an ALJ's decision that

is supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Stated

otherwise, if an ALJ's decision is supported by substantial evidence, then that decision will be

sustained, even where there may also be substantial evidence to support the claimant's contrary

position. *Id.*

      "Substantial evidence" is evidence that a reasonable mind would accept as adequate to

support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (citation omitted); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in

other contexts, the threshold for such evidentiary sufficiency is not high"). The substantial

evidence standard is "a very deferential standard of review—even more so than the 'clearly

erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable

factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443,

448 (2d Cir. 2012) (emphasis in original) (citations omitted). "[A district court] must 'consider the

whole record, examining the evidence from both sides, because an analysis of the substantiality of

the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x

401, 403-04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d

Cir. 1988)).

## IV.   DISCUSSION

The plaintiff claims that the ALJ erred in two respects. First, she contends that the ALJ improperly weighed the medical opinion evidence in that he failed to explain why he declined to afford controlling weight to the opinion of Dr. Doherty, her treating neurosurgeon. (*See* Doc. No. 15-1 at 3-6). Next, the plaintiff argues that the ALJ failed to properly develop the record and did not base his RFC determination on a medical opinion. (*See id.* at 7-8).

The Commissioner disputes the plaintiff's arguments, asserting instead that the ALJ properly considered the plaintiff's medical impairments; the ALJ need not further develop the record; and substantial evidence supports the ALJ's RFC finding. (*See* Doc. No. 17-1 at 4-16).

For the reasons that follow, the Court finds that the ALJ improperly evaluated the medical opinion evidence and remands the matter for further proceedings consistent with this Ruling; however, the ALJ need not develop the record further on remand.[10]

### A.   The ALJ's Consideration of the Medical Opinion Evidence

The plaintiff contends that the ALJ "failed to include any discussion or provide any reasons as to whether Dr. Doherty's opinion should be afforded controlling weight." (Doc. No. 15-1 at 4).

The "treating physician rule"[11] requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment [be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d

---

[10] Insofar as the case is remanded for further proceedings, the Court does not pass on the plaintiff's challenge to the ALJ's RFC determination. On remand, the ALJ will base his/her RFC determination on his re-evaluation of the medical opinion evidence in the record.

[11] The Social Security Administration changed its regulations regarding an ALJ's consideration of medical opinion evidence by eliminating the "treating physician rule" for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5848-49 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c. The plaintiff initially filed her disability claim on June 18, 2015; accordingly, the "treating physician rule" applies to her claim.

117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527[(c)(2)] [formerly (d)(2)]). Only opinions from "acceptable medical sources" are entitled to controlling weight. *See* 20 C.F.R. §§ 416.927(a)(2), (c).

When an ALJ "do[es] not give the treating source's opinion controlling weight," he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including "'(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Once an ALJ has considered these factors, he must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [a claimant's] treating source's medical opinion"). "A failure by the Commissioner to provide 'good reasons' for not crediting the opinion of a treating physician is a ground for remand." *Hanes v. Comm'r of Soc. Sec.*, No. 11 CV 1991(JFB), 2012 WL 4060759, at *12 (E.D.N.Y. Sept. 14, 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).

Based on a review of the record evidence and the ALJ's decision, the Court finds that the ALJ failed to properly apply the factors listed in 20 C.F.R. § 404.1527(c)(2), as was required since he decided not to afford controlling weight to the medical opinion of Dr. Doherty, one of the plaintiff's treating physicians.

As an initial matter, Dr. Doherty, a neurosurgeon, is considered an acceptable medical source under the Social Security Administration regulations. 20 C.F.R. § 404.1502(a)(1). The ALJ erroneously identified Dr. Doherty as the plaintiff's "long-time treating orthopedic provider" and

rejected Dr. Doherty's opinion on the basis that his determination that the plaintiff is limited to less than sedentary work activity is inconsistent with his own examination findings and the other medical opinion evidence in the record. (Tr. 1785). Although the ALJ recognized that Dr. Doherty treated the plaintiff "from December 2013 through March 24, 2021," (Tr. 1772), he failed to appropriately consider the nature and extent of Dr. Doherty's treatment relationship with the plaintiff. *See* 20 C.F.R. § 404.1527(c)(2)(1). This failure constitutes "procedural error." *Estrella*, 925 F.3d at 96. The Court's inquiry does not end here, however, as it "must determine if 'the substance of the treating physician rule' was 'traversed' by examining whether the ALJ provided 'good reasons' for his weight assignment." *Lee v. Saul*, No. 5:19 CV 136(BKS), 2020 WL 563430, at *9 (N.D.N.Y. Feb. 5, 2020) (quoting *Estrella*, 925 F.3d at 96).

The Commissioner asserts that the ALJ considered Dr. Doherty a specialist despite identifying him as an "orthopedic provider." (*See* Doc. No. 15-1, citing Tr. 1785). Even if the Court were to accept the Commissioner's assertion as true, the ALJ still erred in his consideration of Dr. Doherty's treatment records and physical medical source statements, and in his assessment of their consistency with the other evidence in the record. Since Dr. Doherty was the plaintiff's treating physician, his opinion is entitled to controlling weight unless the ALJ explicitly articulates why his opinion is not supported by the medical evidence and why his opinion is inconsistent with other medical evidence in the record. *See Estrella*, 925 F.3d at 95; *see also Burgess*, 537 F.3d at 128. The ALJ has failed to make these findings.

The ALJ assigned "minimal weight" to Dr. Doherty's opinion that the plaintiff was limited to less than sedentary work on the basis that his opinion was inconsistent with his own examination findings and the findings of the plaintiff's other medical providers. (Tr. 1785). In support of his finding, the ALJ relied upon notes from Dr. Doherty's examination on March 10, 2021, in which

he indicated that the plaintiff was "showing 5/5 strength in the upper and lower extremities, normal gait, normal posture, normal range of lumbar motion, with only some abnormal sensation to light touch in the left upper extremity and reduced range of neck motion with neck tenderness." (*Id.*, citing Tr. 757-82, 1207-68, 2319-26, 2358-671, 3400-94, 3623-24). The ALJ did not mention Dr. Doherty's other notes from the same examination, however, in which he stated that the plaintiff had "substantial neck and back pain"; he "recommended a posterior facet injection at C7-T1"; and he explained to the plaintiff that "if the injection does not help, . . . she would then be relegated to chronic pain management." (Tr. 3624). By selectively relying on portions of the record that show improvement to the plaintiff's condition without addressing evidence demonstrating that the plaintiff has not fully recovered from her 2015 spinal surgery, the ALJ cherry-picked[12] evidence that supported his finding.

An ALJ "is not permitted to cherry pick from the treatment record evidence that is inconsistent with the treating source's opinion in order to conclude that such opinion should be accorded less weight." *Kelly W. v. Kijakazi*, No. 3:20 CV 948(JCH), 2021 WL 4237190, at *13 (D. Conn. Sept. 17, 2021), *accord Kyle Paul S. v. Kijakazi*, No. 3:20 CV 1662(AVC), 2021 WL 6805715, at *7 (D. Conn. Nov. 16, 2021) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination"). Because "a searching review of the record" has not "assure[d]" the Court "that the substance of the treating physician rule was not traversed," *Estrella*, 925 F.3d at 96, the Court must remand this case to the ALJ. *Quinto v. Berryhill*, 3:17 CV 24(JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017) (citing

---

[12] "The term 'cherry picking' generally refers to 'improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source. . . . The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both.'" *Rodriguez v. Colvin*, No. 3:13 CV 1195(DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) (quoting *Dowling v. Comm'r of Soc. Sec.*, No. 5:14 CV 786 (GTS)(ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) (additional citations omitted)).

*Ortiz v. Colvin*, 3:15 CV 956(SALM), 2016 WL 4005605, at *6 (D. Conn. Jul. 26, 2016)); *see also Ardito v. Barnhart*, No. 3:04 CV 1633(MRK), 2006 WL 1662890, at *5 (D. Conn. May 25, 2006) (holding that the ALJ erred when he "cherry-picked out of the record those aspects of the physicians' reports that favored his preferred conclusion and ignored all unfavorable aspects, without explaining his choices, let alone basing them on evidence in the record").

In further support of his decision to assign minimal weight to Dr. Doherty's opinion, the ALJ stated that "the most recent diagnostic testing and examination findings did not support the need for additional surgical intervention and did not show evidence of significant canal or neural foraminal stenosis in the cervical spine to suggest that her left upper extremity numbness and weakness are . . . the result of cervical pathology." (Tr. 1784, citing Tr. 3400-639, 3729-52). The ALJ offers no evidence in the record to support this finding. Contrary to the ALJ's finding, the results of the plaintiff's electromyography on August 8, 2017 confirm C6 radiculopathy[13] and mild left carpel tunnel syndrome. (Tr. 2188-97, 2486).

The ALJ also stated that "[t]he diagnostic testing from March 2021 and May 2021 showed no lumbar lesions with stable stenosis noted in the cervical spine with no hardware complications and no stenosis in the thoracic spine." (Tr. 1785, citing Tr. 3748). Additionally, the ALJ stated that "[a]s of May 2021, no additional surgery was recommended based upon the diagnostic testing." (Tr. 1785, citing Tr. 3751). The ALJ cited to portions of the record without providing the broader context in which they appear. A review of these records in their entirety reveals that the impressions from the May 2021 MRI of the plaintiff's thoracic spine were: "1. Multilevel disc disease with disc protrusions . . . notably present at T8-T9 level with moderate foraminal stenosis,

---

[13] "Cervical radiculopathy is a disease process marked by nerve compression from herniated disc material or arthritic bone spurs. This impingement typically produces neck and radiating arm pain or numbness, sensory deficits, or motor dysfunction in the neck and upper extremities." Jason David Eubanks, *Cervical Radiculopathy: Nonoperative Management of Neck Pain and Radicular Symptoms*, 81 AM. FAM. PHYS. 33 (2010).

left greater than right. 2. Additional levels demonstrating disc disease with trusion as detailed. 3. T2 hyperintense lesion right hepatic lobe." (Tr. 3748). Moreover, Dr. Rubio's recommendation against additional surgery reflects that he was "unsure of the expected improvement postoperatively, . . . especially given that after her indicated surgeries in 2014 and 2015 she only achieved 20% improvement in her symptoms." (Tr. 3751). Instead, Dr. Rubio "recommend[ed] neurology evaluation with possible consideration for [electromyography] to rule out primary neurologic disorder." (Tr. 3752). Notably absent from the ALJ's decision, however, is any mention of the plaintiff's August 2017 electromyography, which confirmed C6 radiculopathy, or her November 2018 cervical spine MRI, which showed mild to moderate stenosis at C4-5 and C5-6. (Tr. 2188-97, 2315-16). Also absent from the ALJ's decisions is any mention of the plaintiff's November 2018 cervical spine MRI, which showed mild to moderate stenosis at C405 and C5-6. (*Id.*). Although there is objective medical evidence in the record that supports Dr. Doherty's opinion, the ALJ neither discussed it nor explained how it was inconsistent. By cherry-picking only those pieces of the record that support his finding, the ALJ committed error.

The ALJ also maintained that Dr. Doherty's opinion was inconsistent with the examination findings of other medical treatment providers. (Tr. 1785). In support of his position, the ALJ cited to treatment notes from Dr. Coiculescu's examinations of the plaintiff in August 2016 and September 2016, during which she observed that the plaintiff exhibited full strength, as well as normal sensation and gait. (Tr. 1219-20, 1227, 1231, 1785). Contrary to the ALJ's finding, however, the plaintiff's medical records reflect that the cervical spine surgery that Dr. Doherty performed in 2015 did not restore the plaintiff's functionality. (Tr. 950). The plaintiff continued to receive pain management therapy and trigger point injections from NP Kurey after her surgery to alleviate her chronic, severe muscle spasms. (*See, e.g.*, Tr. 749, 1233, 2673-76, 2687-90).

Moreover, Dr. Doherty's treatment notes demonstrate that, although "[t]he first injection helped marginally," the next two injections worsened her symptoms. (Tr. 855). Nevertheless, the ALJ concluded that the plaintiff's "seizures and headaches are well managed with medication and injections." (Tr. 1784).

The ALJ found that "there are no medical findings to show the claimant's limitations preclude the performance of work within the sedentary [RFC]." (Tr. 1784). Moreover, the ALJ concluded that "[o]verall, the medical evidence of record shows the claimant's conditions as largely stable with minimal treatment [and] with no recommendation for a higher level of care." (*Id.*). The ALJ stated that "[b]ased upon the evidence, the claimant's adaptive behaviors are adequate for vocational involvement, . . . and the record does not show evidence to support greater restrictions than provided for in the decisional [RFC]." (*Id.*). In support of his finding, the ALJ stated that "[i]n evaluating opinion evidence, [he] grant[ed] weight according to opinions that are supported by sufficient documentation of evidence, clear articulation for the basis of the opinions, and consistent findings with other objective medical evidence of record." (*Id.*). The ALJ did not specify how much weight, if any, he assigned the medical opinions contained in Dr. Doherty's treatment records, however. The ALJ's discussion of those opinions is limited to his unsubstantiated finding that they are inconsistent with other medical evidence in the record. (*Id.*).

In his October 2017 physical medical source statement, Dr. Doherty opined that, because of the plaintiff's muscle weakness and pain, she needed a job that permitted her to shift positions at will from sitting, standing, or walking; periods of walking around for five minutes every 30 minutes during an eight-hour workday; and unscheduled five-minute breaks every 30 minutes during an eight-hour workday. (Tr. 1766). Dr. Doherty opined that the plaintiff's symptoms were likely severe enough to interfere with the attention and concentration needed to perform even

simple work tasks 25 percent or more of a typical workday. (Tr. 1768). He opined that the plaintiff was capable of low stress work only; her impairments were likely to produce "good days" and "bad days"; and she was likely to be absent from work because of her impairments or treatment for an average of approximately four days per month. (*Id.*).

In his March 2021 physical capacity statement, Dr. Doherty opined that the plaintiff constantly experienced pain so severe and frequently experienced stress so severe that they interfered with the attention and concentration needed to perform simple work tasks. (Tr. 3395). Dr. Doherty further opined that, if the plaintiff was placed in a competitive work environment on an eight-hour workday basis, she could not walk one city block or more without rest or severe pain; walk one block or more on rough or uneven ground; climb steps without using a handrail at a reasonable pace; balance while ambulating; or stoop, crouch, or bend. (*Id.*). He also stated that the plaintiff needed to lie down and/or recline for approximately two hours during an eight-hour workday due to fatigue and pain. (*Id.*). He explained that, during an eight-hour workday, the plaintiff could sit and stand for approximately two hours and needed to take unscheduled breaks away from her work area to lie down/sit quietly for an average of fifteen minutes. (Tr. 3396). Dr. Doherty specified that, based upon the combination of the plaintiff's physical and/or mental limitations, she would be "off task" (*i.e.*, either unable to perform work and/or away from the work environment due to her limitations) for ten percent or less of an eight-hour workday in a competitive work environment. (Tr. 3398). Dr. Doherty estimated that, on average, the plaintiff was likely to be absent from work at least five days per month because of her physical and/or mental impairments, and/or her ongoing and periodic medical treatment and care. (*Id.*). He further estimated that, on average, the plaintiff was likely unable to complete an eight-hour workday at least five days per month because of her physical and/or mental impairments, and/or her ongoing

and periodic medical treatment and care. (*Id.*). According to Dr. Doherty, the plaintiff could be expected to perform a job eight hours per day, five days per week, on a sustained basis less than 50 percent as efficiently as an average worker. (*Id.*).

Despite the abundant medical evidence in the record that is consistent with Dr. Doherty's opinions, the ALJ only cited to those portions of the record that supported his conclusion that the plaintiff was not disabled. By citing generally to "Exhibits B8F, B14F, B19F, B21F, B30F and B31F/129-30," which collectively amounts to over 500 pages of medical records, (Tr. 1785, citing Tr. 757-82, 1207-68, 2319-25, 2358-2671, 3400-94, 3623-24), the ALJ did not satisfy the requirement that he "explicitly consider" the consistency of Dr. Doherty's opinion with the other medical evidence in the record. Although Dr. Doherty is not authorized to determine whether the plaintiff is capable of working, his medical source statements contain opinions that support a finding that the plaintiff is disabled.

**B.      The Plaintiff's Remaining Arguments**

The plaintiff also challenges the ALJ's RFC determination on the basis that it "fails to identify any medical opinion that supports [it]." (Doc. No. 15-1 at 7-8). The Court need not address this issue, however. The "case must return to the agency . . . for the reasons already given, [so] the Commissioner will have the opportunity on remand to obviate th[ese] dispute[s] altogether by" addressing the plaintiff's remaining arguments. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019). Indeed, the plaintiff's challenge to the RFC determination is moot since an ALJ on remand will necessarily have to reassess the plaintiff's RFC upon re-evaluating the medical opinion evidence.

The plaintiff also argues that the ALJ failed to adequately develop the record regarding her impairments before reaching his RFC determination. (Doc. No. 15-1 at 8). The Court disagrees.

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty applies even where, as here, the claimant is represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128. The ALJ's obligation to develop the record exists "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396(JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (citations omitted); *see* 20 C.F.R. § 404.1520b(b)(2)(i).

Considering the record upon which the ALJ based his decision, he was not duty-bound to contact Dr. Doherty regarding his opinions. *See* 20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2) (noting that an ALJ *may*, but is not required to, contact a medical source before reaching a disability determination). Where an ALJ has ample evidence to determine a claimant's RFC, there is no need for him to further develop the record. *See Jones v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order). Here, the ALJ considered the plaintiff's medical records and testimony, Dr. Doherty's opinions, and the other medical opinion evidence in the record. (Tr. 1779-85). The record was "adequate for [the ALJ] to make a determination as to disability." *Perez*, 77 F.3d at 48. Accordingly, the ALJ need not further develop the record on remand.

## V.    CONCLUSION

For the reasons stated above, the plaintiff's Motion for Order Reversing the Commissioner's Decision (Doc. No. 15) is **GRANTED** such that this case is remanded for further proceedings consistent with this Ruling, and the Commissioner's Motion for an Order Affirming the Commissioner's Decision (Doc. No. 17) is **DENIED**.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment may be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 11th day of January 2023 at New Haven, Connecticut.

  /s/ Robert M. Spector, USMJ  
Robert M. Spector  
United States Magistrate Judge